UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

BENJAMIN T. REED,

                Plaintiff,

-vs-

MAGGIE GROSSO, ROBIN DOWNS, DR. SOHAIL GILLANI, LACEY HASTREITER, DR. KALYANA BATTU, KYLEE CRISCIONE, and JOHN AND JANE DOE NOS. 1–8,

                Defendants.

DECISION AND ORDER

15-CV-6401-CJS

## APPEARANCES

For Plaintiff:    Bradley Kammholz, Esq. *pro bono*
Kammholz Messina LLP
1501 Pittsford-Victor Road Suite 202
Victor, NY 14564
(585) 678-4500

For Defendants:    Gary M. Levine, A.A.G.
State of New York
Attorney General's Office
144 Exchange Boulevard, Suite 200
Rochester, NY 14614
(585) 327-3223

## INTRODUCTION

**Siragusa, J.** Pro bono plaintiff's counsel filed a comprehensive amended complaint in this prisoner civil rights case alleging, *inter alia*, deliberate indifference to serious mental health needs. Amended Compl., Jul. 5, 2017, ECF No. 53. Now before the Court is Defendants' motion to dismiss, filed August 17, 2017, ECF No. 54. The Court has reviewed the papers submitted in support of, and in opposition to, the motion, and heard oral argument. For the reasons stated below, the Court grants Defendants' application and dismisses the case.

## BACKGROUND

The Court appointed pro bono counsel on October 5, 2016. Order, ECF No. 42 (Hon. Jonathan W. Feldman, USMJ). Counsel undertook an extensive review of the records of medical treatment and filed an all-inclusive amended complaint, which Defendants now seek to have dismissed. For the purposes of analyzing the motion, the Court assumes that the allegations in the amended complaint are true. That document details the history of Plaintiff, who has a documented record of self-harm throughout various transfers within the Department of Community and Correctional Services ("DOCCS") from one prison to another, with extensive stays in each prison's Residential Crisis Treatment Program ("RCTP").

Plaintiff's relevant history begins with a January 23, 2001, screening by the New York Office of Mental Health at the Mohawk Valley Psychiatric Center during his first incarceration with DOCCS. In the course of questioning, Plaintiff reported that he had been diagnosed in May 2000 with paranoid schizophrenia and that, as a result, had been hospitalized at Four Winds Mental Health Hospital. Amended Compl. ¶ 10. The next screening took place in early November 2006 at the Groveland Correctional Mental Health Unit, where it was noted that Plaintiff might need treatment for anxiety, mild depression adjustment disorder and life circumstance problems. Amended Compl. ¶ 11. Plaintiff has also indicated that he had been admitted to the Richmond, Virginia, Community Hospital "for making serious threats against his family," for being "hyper-religious," and for "aggression," and that he had a childhood history of cutting himself. *Id.* ¶ 11.

Plaintiff began a second incarceration with DOCCS in early April 2011. *Id.* ¶ 12. He was then screened at Elmira Correctional Facility where the records noted that he had a history of psychosis. *Id.* ¶ 13. He received further screenings in 2011, and on July 19, 2011, a progress note included information that Plaintiff had "a history of cutting himself with knives on his arms starting from about age 10, and that he had cut himself 20–30 times, with the last time being in 2004." *Id.* ¶ 15.

In April 2013, his condition worsened and he was downgraded to mental health service level 1 (indicating a major or serious mental illness with active symptoms requiring treatment and not having six months of psychiatric stability). *Id.* 16. He was subsequently upgraded to level 3, but later downgraded again to level 1, and transferred in mid-July 2013 from Groveland Correctional Facility ("Groveland") to Mid-State ("Mid-State") Correctional Facility because Groveland could not handle a level 1 inmate. *Id.* 16–19.

At the end of September 2013, Plaintiff "was admitted to the Central New York Psychiatric Center Mid-State Correctional Facility (Residential Crisis Treatment Program) Observation Cells after banging his head against a wall and threatening to hurt himself and others, while he was being taken to the Special Housing Unit ('SHU') for solitary confinement." Amended Compl. ¶ 20. Because of threats against staff, he was reclassified as requiring maximum security and, consequently, transferred to Auburn Correctional Facility ("Auburn") in late October 2013.

While at Auburn, Plaintiff received further mental health evaluations and a diagnosis of "adjustment disorder with mixed anxiety and depression, rule out schizophrenia, bipolar disorder, and anti-social personality disorder." *Id.* ¶ 24. In early January 2014, he

was released from SHU and put into the general population at Auburn. Two days later, he cut his left arm multiple times with his razor. *Id.* ¶ 26. He was admitted to Auburn's infirmary with a one-on-one watch. Amended Compl. ¶ 27. Defendant Maggie Grosso ("Grosso"), a licensed social worker or mental health professional employed by either DOCCS or the New York State Office of Mental Health at Auburn, or both, interviewed Plaintiff, who told her that everyone wanted to kill him and he planned to cut himself enough to bleed to death. He also stated he had received "kites"[1] containing death threats. *Id.* ¶ 28. In a later interview, Plaintiff told Grosso he needed protective custody "because of a problem with a 'high ranking Blood (gang) member' threatening him in SHU." Amended Compl. ¶ 29. Grosso noted Plaintiff would be transferred to an RCTP bed as soon as one became available.

He was discharged in mid-January 2014 from the RCTP into the infirmary while waiting for a bed in protective custody to open up. *Id.* ¶ 31. Two weeks later, he was readmitted to Auburn's RCTP. He was having a problem with another inmate in protective custody and was refusing medication. He complained that he was hearing a "thing" whispering to him, "a negative esoteric entity" he could not "turn off." *Id.* ¶ 32.

On or about February 4, 2014, Grosso interviewed Plaintiff again. He told her that he "tried to play the psychiatrist" and that he "told him he was going to kill everybody" saying, "I pulled a stunt because I need to get my cell moved." *Id.* ¶ 33. The next day, he

---

[1] "'kite,' *i.e.*, send through a third party, letters to an inmate at another facility with whom he was not authorized to correspond. *United States v. Felipe*, 148 F.3d 101, 105 (2d Cir. 1998); *see also* Urban Dictionary, "kyte" (https://www.urbandictionary.com/define.php?term=kyte) last accessed Oct. 27, 2017 ("Prison slang for a contraband letter or other form of communication.").

was transferred to Auburn's SHU in compliance with his desire for isolation. *Id.* ¶ 34. He was receiving psychological therapy in May and June. *Id.* ¶¶ 35–38.

Because of his paranoid behavior, the DOCCS security team at Auburn referred Plaintiff for mental health screening. On July 11, and July 14, family members called the prison expressing concern about his misdiagnosis of adjustment disorder, anxiety, and depression. Plaintiff's therapist conducted a screening interview on July 23, 2014, and noted that Plaintiff was "thinking about cutting my arms again sometimes." Amended Compl. ¶ 40.

Plaintiff was readmitted to RCTP on August 14, 2014, based upon his threats to harm himself. *Id.* ¶ 41. On October 6 and 7, 2014, he was transferred from Auburn's SHU to Clinton Correctional Facility ("Clinton"), where he entered the general population. *Id.* ¶ 42. A few days later, on October 11, 2014, he cut himself 30 times with a razor, each cut from one inch to one and one quarter inch in length. *Id.* ¶ 43. He was admitted to Clinton's infirmary for observation, as Clinton had "no actual CNYPC [sic] Observation Room available." *Id.* ¶ 44. He was "discharged from RCTP Observation Room" on October 20, 2014, and moved to protective custody at Clinton. *Id.* ¶ 46. He was readmitted to RCTP on four more occasions, and returned to protective custody. *Id.* ¶¶ 47–50. On or about May 1, 2015, he was informed that he was going to be transferred to Attica Correctional Facility ("Attica). *Id.* ¶ 51. On the same day, he "was readmitted to Clinton's RCTP Observation Unit because of threats of self-harm, paranoid delusions, tying his cell bars together, and seeing demons." *Id.* ¶ 52.

Plaintiff alleges that on May 7, 2015, he was transferred from the RCTP directly to Attica and was "mentally unstable" and "critically in need of a continuum of mental health care." *Id.* ¶ 58. He further alleges that Defendants Robin Downs ("Downs"), Sohail Gillani (Gillani"), and/or John and Jane Doe Nos. 1–8 were aware of his mental instability and "critical need of a continuum of mental health care." *Id.* ¶ 59. En route to Attica, Plaintiff spent time at Downstate Correctional Facility ("Downstate") where he threatened to harm himself and, as a result, was admitted to Downstate's Forensic Diagnostic Unit for observation. *Id.* ¶ 65.

Around May 12, 2015, despite his protests, Plaintiff was transferred from the diagnostic unit at Downstate to Attica. He alleges he was then "mentally unstable" and "critically in need of a continuum of mental health care." *Id.* ¶ 71. He further alleges that defendants John and Jane Doe Nos. 1–8 "ordered, approved or allowed plaintiff's transfer from Downstate CF to Attica CF while he was mentally unstable and severely in need of a continuity of mental health care." *Id.* ¶ 73.

While en route to Attica from Downstate, Plaintiff was admitted to Auburn's RCTP, and stated, "I have gang trouble, I can't go to Attica, I am not safe there, I know I am safe here." *Id.* ¶ 77. He was to be released from custody in seven months, but feared for his safety. After being asked about the scars on his left arm, Plaintiff explained, "I had to cut myself to show people I was serious. It's better to do that than something more destructive." *Id.* ¶ 77.

On May 14, 2015, defendant Grosso examined Plaintiff.

Defendant Grosso noted: that plaintiff was "known to this writer from previously housing at Auburn and utilizing RCTP during that time due to difficulty

6

> adjusting to SHU confinement"; that plaintiff was in PC at Clinton and asked who had signed him out of PC prompting his transfer; that defendant Grosso explained to plaintiff that housing in PC is not a permanent placement at any facility and the he would need to request PC at his next facility if it was needed; that plaintiff stated he knew he was going to Attica and was going to refuse to go there; that defendant Grosso informed plaintiff that he could not entrench himself in RCTP simply because he did not want to transfer; and that plaintiff stated, "Well, I'm not going. There is gonna be a fight up in here."

Amended Compl. ¶ 78. Nevertheless, defendants Grosso and John and Jane Does Nos. 1–8 decided to discharge Plaintiff rom Auburn RCTP and continue with his transfer to Attica. *Id.* ¶ 79. Plaintiff alleges "defendants Grosso and/or John and Jane Doe Nos. 1–8 were aware of plaintiff's mental instability and his critical need of a continuum of mental health care at the time of his transfer from Auburn CF to Attica CF." *Id.* ¶ 82.

On or about May 15, 2015, Plaintiff was admitted to Attica's RCTP because of self-harm. *Id.* ¶ 87. He was interviewed and,

> Plaintiff reported that, while he was on the transfer bus, he panicked because "lots of people recognized me and I have had problems in many facilities and have people out to get me."; plaintiff stated, "I have lots of enemies and people trying to kill me. My situation is crazy. I fear I won't survive here. I want to go to a low conflict jail like Sullivan or Green Haven."; plaintiff disclosed that he is a "Gangsta Disciple Crip" and is fearful of population; and that PC process was reviewed and patient stated he planned to talk with the Sergeant when he sees him to be released from quarantine status.

*Id.* ¶ 88. Also on May 15, 2015, defendant Dr. Kalyana Battu ("Battu"), a licensed physician, examined Plaintiff. Plaintiff alleges that Dr. Battu,

> noted that plaintiff was admitted to RCTP Observation after plaintiff told staff that he was suicidal. Dr. Battu noted plaintiff reporting: that he was afraid of inmates at Auburn and that was why he told staff that he was suicidal and hearing voices but he was not suicidal nor was he hearing voices at that time; that he was in PC at Clinton and wants to be in PC at Attica. Defendant Battu also noted that plaintiff insisted that he was not suicidal and wanted to be discharged from RCTP.

7

Amended Compl. ¶ 89. On that same day, defendants Kylee Criscione ("Criscione"), a licensed social worker employed by either DOCCS or the New York State Office of Mental Health, Battu and John and Jane Doe Nos. 9–12 decided to discharge Plaintiff from Attica's RCTP into the general population. *Id.* ¶ 90. Plaintiff was not actually moved until May 28, because of his mental instability. *Id.* ¶ 92. He reported hearing voices telling him to prepare for war. *Id.* ¶ 93. On May 18, 2015, Criscione examined Plaintiff after nurses and officers heard him threaten self-harm while he was bring moved from RCTP to his new cell. Plaintiff had smeared feces all over his face and told Criscione, "I had a bad episode of anxiety and panic.... My situation is crazy. I don't want to put it on the fate [sic] but I will talk privately." Amended Compl. ¶ 94. After speaking with Plaintiff, Criscione concluded that Plaintiff's "motive for RCTP placement is questionable as he has made it very clear that he does not want to go to Attica's general population.... [N]o psychotic symptoms had been observed or reported. Insight and judgment are poor." *Id.* ¶ 94. He remained in RCTP.

On May 19, 2015, while he was still in RCTP, defendant Lacey Hastreiter ("Hastreiter"), a licensed social worker employed by either DOCCS or New York State Office of Mental Health at Attica, examined Plaintiff and made the following notes:

> "Reed acknowledged fear of COs and inmates. He fears being sexually assaulted, physically assaulted, or killed. He reports that people know him and have been saying things about how he is going to be attacked. Reed reports that he will smear feces on himself if he believes it will make people keep their distance from him. Reed indicated, 'I want to go home, I want to survive.' Discussed Reed's fears and utilizing DOCCS resources in an effort to address his fears. Discussed requesting protective custody. Reed is aware of the process for protective custody. Treatment team decision for Reed to remain in RCTP pending VTC MD evaluation."

Amended Compl. ¶ 95 (quotation marks in original without citation to source).

On May 20, 2015, Criscione examined Plaintiff again and made the following notes:

> "Patient stated, 'If am being honest, I am scared shitless. I am precise and particular with all my moves and I don't even know how to make this situation better.' Patient reports he has not been telling the truth to OMH staff and the doctor. Patient and writer discussed and processed the importance of honesty. Mr. Reed has a release date of 12/15/15 and fears [sic]. Discussed requesting protective custody and he is aware of the process for protective custody. Patient reports, 'I am not suicidal. I am not homicidal. I want to go home to my family and children. I want my career and to have just one woman in my life.' Pro-social coping skills were reviewed. Patient presents as alert and oriented to person, place, and date. Speech of normal rate, volume, and tone. Mood is situationally anxious. No psychotic symptoms observed or reported. Insight and judgment are poor at this time. Treatment team decision for Reed to remain in RCTP pending VTC MD evaluation this week. Start Remeron 30 mg nightly and Vistaril 50 mg every morning."

Amended Compl. ¶ 96. Criscione examined Plaintiff the next day, again in RCTP, and made the following notes:

> "Mr. Reed reports he feels that him being placed in Attica was 'retaliation' against him. He reports that he was 'snuck out' of Clinton CF and stated 'I can't be here. I don't want to be here.' He reports he wants to be in a 'low populated, low conflict prison' such as 'Adirondack, Hudson, Ogdensburg, Mohawk.' He reports he has been on [Administrative segregation] in the past for his gang affiliation and reports due to his affiliations he fears for his life in Attica. He reports another inmate who he knew previously from Auburn CF is currently in RCTP and that that inmate has advised others in the Unit that he is in Attica and to 'put the word out.' He reports his anxiety has increased significantly due to his current protection concerns. Mr. Reed discussed possibly being prescribed medication for his anxiety and inability to sleep. He reports he is unsure if PC can even be an option for him and he wants a transfer out of Attica. Mr. Reed was again advised that he needs to work with DOCCS staff regarding any possibility of a transfer. Treatment team decision—patient to remain in RCTP to monitor adjustment to newly prescribed medication as he does present with situationally anxious mood. Writer spoke with Acting Unit chief Hastreiter regarding patient's case. AUC

Hastreiter contacted Captain Trowbridge, acting DSS, to advise him of patient report and his protective custody concerns."

Amended Compl. ¶ 97. On May 23, 2015, Plaintiff began a hunger strike. *Id.* ¶ 98. On May 27, 2015, Hastreiter examined him, still in RCTP, and made the following notes:

> "Mr. Reed reports no changes in his status. He continues to report high anxiety related to his personal safety concerns. Reed reports he is now eating meals and will work with mental health and security in an effort to address his concerns appropriately. Impulse control is questionable. It is likely that Reed may engage in self-injury if he feels that such an act will remove him from an unfavorable situation. Judgment and insight are poor. Treatment team decision for Reed tor remain in RCTP at this time. He will be scheduled with the VTC MD for assessment/evaluation. Once Reed is clinically discharged from RCTP arrangements will be made with DOCCS security to have Reed interviewed by security regarding his personal safety concerns."

Amended Compl. ¶ 99. A nursing note from May 28, 2015, at 9 o'clock in the morning stated that Plaintiff appeared angry and stated, "I will cut myself when they send me out of here just so I can come right back!" *Id.* ¶ 100.

Dr. Battu examined Plaintiff, still in RCTP, on May 28, 2015, and made the following observation:

> "Inmate looks relaxed and states that he feels rested and wants to be [discharged] from RCTP. He promised that he will work with docs and will talk to them if he has any issues. He continues that he will talk to Docs if he feels unsafe about other inmates. Admitted from Clinton on his way from Clinton to Attica he was at Auburn where he was put in RCTP after he told staff that he was suicidal and 'hearing self.' He insists that he is not suicidal, promises that he will talk to staff if he needs any help. Case discussed with clinician in detail. He looks relaxed. He is cooperative, coherent and relevant, thinking is organized, no evidence of psychosis noted, mood is euthymic and affect is full and is appropriate to his content of thought, no suicidal or homicidal ideations elicited. No impulsive behavior noted. Judgment and insight are good. Stable and discharge from RCTP."

Amended Compl. ¶ 101. Plaintiff was discharged from RCTP on May 28, 2015, and

placed in the general population. The next day he "was found with multiple self-inflicted cuts, stating that he wanted to die." *Id.* ¶ 102–03. He was readmitted to RCTP.

Plaintiff contends that at the time of his discharge from RCTP at Attica on May 28, he "was mentally unstable and critically in need of a continuum of mental health care (including further confinement in the RCTP Observation Unit." *Id.* ¶ 104.

## STANDARDS OF LAW

### Motion to Dismiss

In analyzing a motion to dismiss, the Court accepts the non-conclusory allegations in the complaint as true and draws all reasonable inferences in favor of the plaintiff. *Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009). The Court applies a plausibility standard, that is, the Court analyzes the facts plead to ascertain whether the plaintiff has stated a plausible claim for relief. "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1940 (2009).

### Eighth Amendment Claims

As the Supreme Court stated in *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,'...proscribed by the Eighth Amendment." Mere negligence is not sufficient to prove an Eighth Amendment violation. Instead, a Plaintiff making an Eighth Amendment claim against corrections officers or prison medical staff "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.*

11

The Supreme Court in *Farmer v. Brennan*, addressed the issue of protecting a prisoner from assault. In that case, the Court wrote:

> The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial "risk of serious damage to his future health," and it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk.

*Farmer v. Brennan*, 511 U.S. 825, 843 (1994) (quoting *Helling v. McKinney*, 509 U.S. 24, 35 (1993)).

## ANALYSIS

Plaintiff's first cause of action alleges that defendants were deliberately indifferent to his serious medical needs. In that regard, the allegations detailed in Plaintiff's complaint show that Defendants took Plaintiff's mental health complaints seriously and provided him with care, including medications and observation in a setting separate from the general population in each prison which he was housed while en route to Attica. While at Attica, he was also provided treatment in a setting apart from the general population, until, as related in paragraph 101, he told Dr. Batu he wanted to be discharged from RCTP. Plaintiff has failed to plead a plausible claim that Defendants were deliberately indifferent to his medical needs, assuming for this motion that he has plausibly plead that his medical needs were serious.[2] The facts plead, especially in paragraph 101, lead to the logical conclusion that Defendants did not release Plaintiff into the general population until he

---

[2] The amended complaint infers that Plaintiff was exaggerating his mental condition to obtain his goal of remaining out of the general population at Attica. Further, Plaintiff's conclusory allegations in paragraph 59 are insufficient to show that defendants at Clinton are liable.

requested it, and only after Dr. Batu discussed with him his options for protective custody. This hardly shows that Defendants knew of and disregarded an excessive risk to Plaintiff's health or safety. *Farmer*, 511 U.S. at 837. Paragraph 101 belies Plaintiff's argument that he was emotionally and mentally unstable at the time Defendants released him into the general population at Attica. Nothing in the amended complaint leads the Court to conclude that Plaintiff has plausibly plead that Defendants ignored Plaintiff's mental health status, or emotional and mental stability, and that they released him from RCTP disregarding a significant risk he would harm himself.

Turning to his second cause of action, alleging that the John and Jane Doe defendants were deliberately indifferent to his security needs, the Court finds, again, that Plaintiff's pleading falls short. Since he expressed concerns about being attacked by Bloods and Crips at Attica, the Attica Defendants provided Plaintiff with the option to go into protective custody. Previously, Plaintiff applied and was eventually approved for protective custody at Auburn. Amended Compl. ¶ 31. When he "admitted to having trouble with another inmate in Protective Custody," he was returned to the RCTP at Auburn. *Id.* ¶ 32. While in RCTP, he admitted to Grosso that he "tried to play the psychiatrist. I told him I was going to kill everybody. I pulled a stunt because I need to get my cell moved." *Id.* ¶ 33. At Plaintiff's request, he was transferred from RCTP to Administrative Segregation at Auburn's SHU. *Id.* ¶ 34. He was being treated by a therapist. *Id.* ¶ 37. He was also in protective custody at Clinton in October 2014. *Id.* ¶ 46. When told that he would be transferred to Attica, Plaintiff inquired about protective custody, and he was informed by Criscione about the process for requesting it. *Id.* ¶¶ 88, 96. Later, Hastreiter advised

Plaintiff about requesting protective custody and noted, "Reed is aware of the process for protective custody." *Id.* ¶ 95. Again, assuming that Plaintiff's security concerns with relation to gang violence were serious, Defendants did not ignore those concerns, or take action showing that they were indifferent to his concerns. Rather than telling Plaintiff his concerns were unfounded, or there was nothing to be done, two social worker defendants advised him and ensured he was aware of the process for requesting protective custody at Attica, as he had successfully done at Auburn and Clinton. Far from showing deliberate indifference, the pleading's facts show that Defendants took reasonable steps to ensure Plaintiff's safety.

## CONCLUSION

For the reasons stated above, the Court determines that Plaintiff's amended complaint fails to state plausible claims of Eighth Amendment violations. The Court appreciates the detailed allegations Plaintiff's *pro bono* counsel included in the amended complaint. However, even construing the facts in a light most favorable to Plaintiff, the Court must grant Defendants' motion, ECF No. 54, and dismiss the complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6). With the appreciation of the Court, *pro bono* counsel is relieved from representing Plaintiff further in this matter.

IT IS SO ORDERED.

Dated: November 15, 2017
       Rochester, New York

ENTER:

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge